THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAR-RELL HUMPHRIES, Defendant-Appellant.

Second District    No. 2—92—0984

Opinion filed February 4, 1994.

David C. Thomas, of Chicago, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers, Lisa Anne Hoffman, and Robert J. Biderman, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Following a jury trial in the circuit court of Du Page County, defendant, Darrell Humphries, was convicted of unlawful possession of 900 grams or more of a controlled substance containing cocaine with intent to deliver (Ill. Rev. Stat. 1989, ch. 56$^{1}$/$_{2}$, par. 1401(a)(2)(D) (now 720 ILCS 570/401(a)(2)(D) (West 1992))) and sentenced to a term of 15 years' imprisonment. Defendant filed a timely appeal from his conviction and sentence, raising the following issues: (1) whether he was denied his right to the effective assistance of counsel; (2) whether the trial court erred in refusing to suppress statements made by defendant; and (3) whether defendant was lawfully sentenced under the Super Class X felony provisions.

This case involves a "reverse buy" undercover operation. In March 1990, S.M., an admitted drug dealer, was cooperating with the Du Page Metropolitan Enforcement Group (DuMEG) in hope of receiving a favorable disposition on controlled substance delivery charges pending against him. S.M. received a call from Thomas Conneely, to whom S.M. had sold drugs in the past. When Conneely inquired about purchasing more drugs, S.M. told Conneely that he was out of the business. S.M. gave Conneely a pager number belonging to DuMEG agent Larry Wiess and told Conneely that the guy at that number could sell him a kilogram of cocaine. Conneely subsequently contacted Wiess for the purpose of obtaining drugs. Wiess testified that Conneely asked him if he could deal kilograms of cocaine.

On March 9, 1990, defendant and Conneely met with Wiess at a restaurant in Villa Park. Acting in an undercover capacity, Wiess represented himself to be a drug dealer named "Tony." Defendant asked Wiess how much a kilogram of cocaine would cost and Wiess quoted him a price of $18,000. Defendant said that he had the money

with him and wanted to obtain the drugs that night, but Wiess responded that he could not get the drugs immediately. According to Wiess, defendant left, placed a phone call, and returned to inform Wiess that he had just purchased nine ounces of cocaine from another source. Defendant told Wiess to contact Conneely if he was able to get a kilogram of cocaine.

Two days later, Wiess called Conneely and told him that he had the cocaine. According to Wiess, Conneely said he would contact defendant and get back to Wiess. That evening Wiess received a page, and, when he called the number, defendant answered. Defendant subsequently arranged to purchase the cocaine from Wiess the next morning, indicating that he would be bringing another person along whom Wiess had not yet met. Wiess testified that defendant had asked him to represent the cost of the kilogram as $20,000 so he could make an extra $2,000 off the third party.

The following day, Wiess met with defendant and Keith Moody in the parking lot of a Villa Park supermarket. After a brief conversation, defendant got into the front passenger seat of Wiess' car and Moody got in the backseat. Wiess handed Moody a package of cocaine and defendant handed Wiess a paper bag which contained $18,000. Shortly thereafter Wiess activated an arrest signal and both defendant and Moody were taken into custody by members of a DuMEG surveillance team.

Defendant was transported to the Oakbrook Terrace police station where he was advised of his rights and interviewed by Officers Raymond McGury and Barbara Durnil and Assistant State's Attorney Brian Ruxton. Defendant told them that he and Conneely had met Wiess at the restaurant on March 9. They had been prepared to buy a kilogram of cocaine right then and had the $18,000 on them, but Wiess did not have the cocaine. Defendant stated that he then met Wiess on March 12 in the supermarket parking lot. Defendant was accompanied by Moody, who had provided $10,000 of the money and was to get one-half kilogram of the cocaine. Defendant stated that he had been given the other $8,000 from an individual whom he knew only as "John." Defendant stated that he owed John $2,000 from a previous cocaine debt, and John had agreed to forgive it if he obtained the one-half kilogram of cocaine for him.

Prior to trial, defendant filed a motion to suppress his statement. Defendant testified in support of this motion that although he had been advised of his rights and understood them, he had never waived his rights either explicitly or implicitly.

McGury testified that he read defendant his rights off a pre-printed form and asked defendant after each right whether he

understood it. In each case defendant acknowledged that he had understood the advisement. McGury then gave defendant a copy of that form and advised him to read each of the rights himself and place his initials after them if he understood that right. Defendant also read and initialed a provision under the "Waiver" section of the form which asked "Do you understand each of these rights I have explained to you?" Defendant subsequently signed at the bottom of the form, and both McGury and Durnil signed as witnesses. McGury acknowledged that he did not read, or have initialed, the provision under the "Waiver" section of the form which asked "Having these rights in mind, do you wish to talk to me/us?" McGury testified, however, that defendant "verbally" agreed to talk to him after having been advised of his rights:

"Q. [Defense attorney]: So you never asked him: Having these rights in mind, do you wish to talk to me? Is that right?

A. No, not off of that form; that's correct.

Q. Well, not only not off the form, but you never gave it to him orally. Isn't that true?

A. That's not true.

Q. Well, what did you say to him?

A. After he initialed all of those rights and signed it, I asked him: I would like to interview you as to what transpired today. He said, that's fine."

Officer Durnil confirmed McGury's testimony regarding the reading and execution of the rights form, but stated that McGury never asked if defendant wished to talk to him. Testifying at the suppression hearing, defendant acknowledged that he was advised of his rights, had initialed the appropriate places on the preprinted form, and had understood each of his rights. Defendant stated, however, that he had never been asked whether he wished to talk to McGury, Durnil, and Ruxton and he had felt he had no choice but to answer their questions. Defendant acknowledged that it was his desire to cooperate with the police and he did not want to cause any hassle.

The trial court denied defendant's motion to suppress, commenting that "upon review of all testimony, the Court finds the Defendant was properly advised of his constitutional rights, he waived his rights and in no way was he doing so with any threats or coercion being exercised." At trial, defendant was convicted of the charged offense.

Initially, defendant contends that he was denied the effective assistance of counsel. (See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8.) Defendant cites several examples of purported error by his trial counsel: (1) trial counsel failed to investigate and raise

the defense of compulsion; (2) trial counsel failed to give an opening statement; (3) trial counsel's cross-examination of the State's witnesses was unsatisfactory; (4) trial counsel failed to request an instruction limiting the use of "other crimes" evidence at the time it was admitted; (5) trial counsel did not call witnesses on behalf of defendant except one who was, in reality, the main witness against defendant; (6) trial counsel failed adequately to prepare and present sufficiently the defense of entrapment; (7) trial counsel failed to inform defendant that he had a right to testify and that it was his decision whether he wanted to testify; and (8) trial counsel failed to tender a lesser-included offense instruction or discuss the tender of such instruction with defendant.

In support of his motion for a new trial, defendant filed an affidavit, averring the following facts. Defendant stated that he had been using cocaine since 1983. Around 1988 he met an individual named Ray Wagner who would sell him cocaine to support his then $50- to $100-a-day cocaine habit. Eventually defendant's cocaine purchases from Wagner grew and, by March 1990, he had become indebted to him for $3,000. Defendant stated that Ray was a big man who carried a gun and had bodyguards.

In March 1990, defendant "beeped" Ray to get more cocaine, but Ray had none. Ray asked defendant whether he knew anyone who could get some. Defendant averred that he told Ray he had met Tom Conneely, who said he could get anything, and Ray asked defendant to contact Conneely and find out if he could get one-half kilogram of cocaine. Defendant found Conneely and told him that he was looking for "a half a ki." Conneely said that he would contact his supplier, S.M., and get back to him.

Defendant went back to Wagner and told him this information. Defendant averred that he only intended to put Wagner in touch with Conneely, but Wagner insisted that defendant get the drugs and offered to take $2,000 off of his cocaine debt in exchange for doing the deal. Defendant protested, saying that he did not want anything to do with Conneely and that he did not want to take any chances on handling that amount of cocaine. Wagner then told him that he did not care, that defendant owed him a lot of money, and that he knew where defendant and his family lived. Defendant averred that Wagner then produced a gun and said "Don't make me have to use this."

Defendant further averred that when he and Conneely met Wiess on March 9, he had intended to only get one-half kilogram, but Wiess kept trying to talk him into buying one, two, or three, and it seemed like he did not want to sell just a half. When Wiess said he could not get the drugs that day, defendant called Wagner, and Wagner gave

him instruction on how to purchase nine ounces of cocaine from another guy. Defendant did this and Wagner took a couple of hundred dollars off his debt, but Wagner continued to press defendant to get the one-half kilogram.

Defendant averred that he subsequently called Wiess to set up the deal. Defendant also called Keith Moody and asked him "if he wanted to go halves on a kilo." Keith agreed to pay $10,000 for his half. Defendant said he did this because Wiess kept pushing him to buy a whole kilo, Wiess said that the price of a kilogram of cocaine would be $18,000, Wagner had given him only $8,000, and he did not want to tell Wagner that it would cost more.

After he made the purchase and was arrested, defendant stated that he ran into Wagner. Wagner had told him "You best keep your mouth shut or something will 'accidentally' happen to you or your family."

Defendant also stated in his affidavit that after his counsel discussed an entrapment defense he decided not to volunteer anything about Wagner or how Wagner was threatening him because he was afraid it would make Wagner mad. Defendant averred that his trial counsel never asked him if he had been forced to make the buy or informed him of his right to testify at trial. His counsel further failed to inform him of his right to decide whether to testify at trial. Defendant stated that if he "had known entrapment was not a viable defense, and *** that compulsion was a defense and that [he] had the right to decide what the defense would be, [he] would have elected to present a compulsion defense."

The State presented an affidavit from defendant's trial counsel which averred that he had discussed all possible viable defenses with defendant and his mother. Trial counsel specifically noted that he had "considered and immediately rejected any defense of compulsion based upon the facts and circumstances of the case." Also, trial counsel stated that during pretrial and the course of trial he had discussed the consequences of defendant testifying on his own behalf and that defendant, defendants' family, and he were all in absolute agreement that defendant should not take the stand in his own defense. In his affidavit, trial counsel specifically averred that although he advised defendant on the matter, he had always left open to defendant the option of testifying on his own behalf.

Defendant then filed a supplementary affidavit which added that he believed that Wagner might have had "bodyguards" following him on the two occasions when he met with Wiess. It also stated that his trial counsel had never brought up the defense of compulsion nor did he ever ask him once "about how the whole thing had happened."

Defendant averred that he never told his attorney about Wagner because he believed that the entrapment defense would work and he was afraid of Wagner.

The trial court denied defendant's post-trial motion, finding that trial counsel's inability to press forward on the entrapment defense was due to an insufficient factual basis rather than any ineffective assistance of counsel. The court noted that although defense counsel had listed entrapment as a defense in the answer to discovery, gone into entrapment during *voir dire,* and attempted to introduce the matter through jury instructions and motions, the theory of entrapment had never reached the stage of admissibility and was, in essence, abandoned by the defense. The trial court concluded that "[o]n the issue of attempted entrapment defense, if I can call it that, the efforts of counsel were not below the objective standards of reasonableness. Had the factual basis been present, obviously, the defense would have been and could have been materialized."

Concerning defendant's claim to a compulsion defense, the trial court referred to the affidavits filed by defendant and the State and found that "[n]owhere is there any hint of there being a compulsion situation nor a hint of future harm," and the trial court concluded that defense counsel had properly determined the defense to be without a factual basis. Specifically, the trial court stated that "measuring the defense of compulsion with the [*Strickland*] test [see *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064], the Court finds that the trial counsel was not ineffective, but was effective under the circumstances." The trial court also found that the fact that an opening statement had not been presented was a matter of trial strategy, not ineffectiveness; that no lesser-included offense instruction was available under the facts; and that the limitation of evidence had been accomplished by the instructions given the jury.

The test for claims of ineffective assistance of counsel has been well defined. A defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness; and (2) as a result of counsel's errors, defendant was deprived of a fair, reliable trial. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *People v. Collins* (1992), 153 Ill. 2d 130, 137; *People v. Rushton* (1993), 254 Ill. App. 3d 156, 171; *People v. Gordon* (1993), 247 Ill. App. 3d 891, 904.) There is a strong presumption that trial counsel's actions were the result of trial strategy rather than incompetence, and a court of review, therefore, will not second-guess decisions which involve counsel's discretion or strategy. (*Gordon,* 247 Ill. App. 3d at 904; *People v. McCaster* (1993), 239 Ill. App. 3d 753, 757.) Also, we

must evaluate counsel's performance from counsel's perspective at the time of his actions rather than from hindsight. *Gordon*, 247 Ill. App. 3d at 904; *People v. Whitamore* (1993), 241 Ill. App. 3d 519, 526.

A reviewing court may proceed directly to the second part of the *Strickland* test and, if it does not find the requisite prejudice, may decide the claim without analyzing the effectiveness of counsel's representation. (*People v. Enoch* (1991), 146 Ill. 2d 44, 56-57; *Rushton*, 254 Ill. App. 3d at 171.) The second prong requires a defendant to demonstrate a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Eddmonds* (1991), 143 Ill. 2d 501, 511; *Rushton*, 254 Ill. App. 3d at 171; *Gordon*, 247 Ill. App. 3d at 904.) It is the defendant who bears the burden of showing that, absent counsel's errors, the fact finder would have had a reasonable doubt of guilt. *Rushton*, 254 Ill. App. 3d at 171; *People v. Edgeston* (1993), 243 Ill. App. 3d 1, 12.

■ Several of defendant's claimed errors could not have resulted in the requisite prejudice necessary to support his claim of ineffectiveness. Trial counsel's decision to reserve, and ultimately forego, opening statement was purely a matter of trial strategy. Defendant has provided this court with no argument evidencing how he could have been prejudiced by this decision. Rather, defendant relies upon this point only in connection with his overall assertion that trial counsel must have been inadequately prepared for trial.

Similarly, defendant argues that trial counsel erred in failing to request a limiting instruction regarding "other crimes" evidence contemporaneous with its introduction. We note, however, that a limiting instruction was ultimately given to the jury at the close of the trial. There may be tactical reasons for deciding to postpone such an instruction, the most obvious of which is to reduce any resulting emphasis on the related testimony. Because an instruction on this subject was ultimately given to the jury, we conclude that defendant has failed to demonstrate actual prejudice.

Trial counsel's failure to request instructions pertaining to lesser-included offenses also fails to satisfy the "actual prejudice" standard. Defendant fails to provide any argument demonstrating that a lesser-included offense instruction would have been appropriate under the facts. Although defendant argues that an instruction might have been given on simple possession of a controlled substance, it was clear and undisputed at trial, and in defendant's subsequent affidavit, that defendant possessed the cocaine with intent to deliver it to Moody and Wagner. Defendant's intent was not a disputed issue. A jury instruction on a lesser-included offense is not to be given unless

supported by an evidentiary basis. (*People v. Russell* (1992), 234 Ill. App. 3d 684, 689; see also *People v. Jones* (1992), 149 Ill. 2d 288, 297-98.) Also, any request for a lesser-included offense instruction would have been inconsistent with trial counsel's attempts to raise the defense of entrapment which required defendant to admit all the elements of the underlying offense. See *People v. Gillespie* (1990), 136 Ill. 2d 496, 503.

Defendant argues that trial counsel failed to "conduct any meaningful cross examination" of the various State witnesses; however, he provides no argument as to what would have constituted a "proper" cross-examination or how it would have helped create a reasonable doubt of defendant's guilt. A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and cohesive arguments presented. (*De Fontaine v. Passalino* (1991), 222 Ill. App. 3d 1018, 1026; 134 Ill. 2d R. 341(e)(7).) Bare contentions without argument and citation to authority do not merit consideration by a reviewing court and are deemed waived. (*People v. Dinger* (1990), 136 Ill. 2d 248, 254; *City of Highwood v. Obenberger* (1992), 238 Ill. App. 3d 1066, 1073.) We consider this contention to have been waived.

Defendant next complains that trial counsel did not call any witnesses on his behalf other than Wiess. We do not agree with defendant's assertion that it was *per se* ineffective to call Wiess as a witness. Although Wiess certainly provided testimony which supported defendant's guilt, taking additional testimony from Wiess could be viewed as a reasonable extension of counsel's attempt to raise the defense of entrapment. Although trial counsel subpoenaed and attempted to call Conneely as a defense witness, he was unsuccessful because of Conneely's assertion of his privilege against self-incrimination. (See U.S. Const., amend. V.) There can be no valid criticism of trial counsel for the codefendant's refusal to testify, a matter beyond counsel's control.

In his post-trial affidavit, defendant averred that many of the threats made against him by Wagner were witnessed by George Gilletly. Defendant, however, has submitted nothing to indicate that George Gilletly would have testified, or that trial counsel even knew of Gilletly or his potential testimony. As defendant admits, his primary difficulty is the result of his failure to disclose to his attorney any facts which might have provided a basis for a defense of compulsion. An attorney cannot be said to be ineffective for failing to call a witness whose identity and potential testimony are, through no fault of the attorney, unknown to him or her.

Regarding defendant's assertion that trial counsel was ineffective

for failing to inform defendant of his right to decide whether to testify, we note that this assertion was directly controverted by trial counsel's affidavit. Because the trial court could find, based upon that affidavit, that defendant had been fully informed concerning his right to testify and that he elected not to exercise that right, we determine that it was not against the manifest weight of the evidence for the trial court to conclude that there was no ineffective assistance on that point.

Defendant's claim of ineffective assistance of counsel focuses primarily upon trial counsel's rejection of the defense of compulsion and his unsuccessful attempts to raise the defense of entrapment. To raise the defense of compulsion to a crime not punishable with death a defendant must demonstrate that he performed the charged offense under the compulsion of threat or menace of the imminent infliction of death or great bodily harm. (See 720 ILCS 5/7—11 (West 1992).) The defense of compulsion requires an impending threat of great bodily harm together with a demand that the person perform a specific criminal act, and a threat of future injury is not enough to raise the defense. (*People v. Scherzer* (1989), 179 Ill. App. 3d 624, 644-45; *People v. Jackson* (1981), 100 Ill. App. 3d 1064, 1068.) The defense is not available, however, if the compulsion arises from negligence or fault of the defendant or if the defendant had ample opportunities to withdraw from the criminal enterprise but failed to do so. (*Scherzer*, 179 Ill. App. 3d at 645-46; *People v. Lee* (1980), 86 Ill. App. 3d 922, 932, *rev'd on other grounds* (1981), 87 Ill. 2d 182; *People v. Rodriquez* (1975), 30 Ill. App. 3d 118, 120.) Moreover, a defense of compulsion is only a defense with respect to the conduct demanded by the compeller. *Scherzer*, 179 Ill. App. 3d at 644; *Rodriquez*, 30 Ill. App. 3d at 120.

■ It is undisputed that defendant did not tell his attorney that Wagner had threatened him. As noted by the trial court, the issue is whether counsel's decisions were incompetent based upon the facts known to him at that time. Because the record demonstrates that there was no basis known to defendant's trial counsel which would have supported a compulsion defense, defendant's claim of error in this regard must fail.

Also, under no interpretation of the facts could there have been a sufficient basis for instructing the jury on the defense of compulsion. Because the threats Wagner allegedly made against defendant derived from a drug debt defendant accumulated by his continuing illegal use of cocaine, defendant cannot claim that the compulsion arose absent his own negligence or fault. It was undisputed that defendant began arranging the cocaine purchase before any threats

were made against him. A compulsion defense was also inapplicable because the threatened harm was not imminent at the time the crime was committed. Rather, some future harm of an indefinite nature was allegedly threatened. Also, Wagner's demand specifically related to the purchase of one-half kilogram of cocaine, and any "compulsion" defendant was under to partake in that portion of the transaction was distinct from defendant's decision to act as a conduit to enable Moody to purchase the other one-half kilogram of cocaine. We conclude, therefore, that even if defendant's trial counsel had discovered the facts now argued as a basis for a defense of compulsion, despite defendant's failure to inform him of them, there was no legal basis for such a defense and, accordingly, no prejudice to defendant.

The last remaining challenge to trial counsel's effectiveness focuses upon his decision to press for the defense of entrapment at trial. Trial counsel attempted throughout the trial to raise two entrapment arguments, one based on simple entrapment and one based on vicarious entrapment. Both the State and defendant note that vicarious entrapment has been discussed and rejected as a viable defense by the Illinois Supreme Court. (See *People v. Weilgos* (1991), 142 Ill. 2d 133.) The facts in the present case, however, are to some extent distinguishable from those in *Weilgos*, and trial counsel's decision to pursue the defense of vicarious entrapment might arguably be characterized as a good-faith attempt to extend the law.

■ Although trial counsel did pursue the defense of vicarious entrapment up to the point of requesting that the jury be instructed on the issue, he also attempted to advance a conventional entrapment defense. Counsel actively attempted to raise these matters through *voir dire* questioning, witness examination, and the submission of proposed jury instructions. We do not measure effectiveness based solely upon the degree of counsel's success. It is a fact of life that there are cases wherein there will not be an effective defense available and counsel will have to rely upon testing the evidence presented and raising arguments questioning its sufficiency. The record in this case demonstrates that counsel made a significant effort to raise a defense of entrapment but ultimately failed not because of incompetence on his part, but because of the nature of the evidence as it unfolded.

The decision to pursue a given line of defense at trial is a tactical one. (See *McCaster*, 239 Ill. App. 3d at 757.) Despite the most thorough investigation and preparation, it is often impossible to predict exactly how witnesses will testify when placed under oath and subjected to adversarial questioning. We cannot find, in hindsight, that an attorney's decision to pursue a line of defense was ineffective

merely because such attempt proved unsuccessful in light of the evidence ultimately admitted. We must, instead, focus upon counsel's decision at the time it was made, considering such factors as what facts were known to the attorney and what testimony he might reasonably anticipate, what possible theories of defenses were available, and what risks were associated with pursuing these alternative theories. Ineffective assistance of counsel may not be established merely from the fact that others in the profession might have made a different decision; it requires the defendant to demonstrate that counsel's decision was so utterly deficient as to cause a deprivation of the right to a fair trial. In the present case, we determine that the actions of defendant's trial counsel did not constitute ineffective assistance of counsel.

Defendant next contends that the trial court erred in failing to suppress his confession. Specifically, defendant contends that although he was advised of his rights in compliance with *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, he did not execute a knowing waiver of those rights. The trial court, however, found the existence of a valid waiver.

In general, statements made during a custodial interrogation cannot be admitted into evidence unless the suspect is given *Miranda* warnings and intelligently waives the right against self-incrimination. (*Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 706-07, 86 S. Ct. at 1612-13; *People v. Laliberte* (1993), 246 Ill. App. 3d 159, 167.) Whether there has been an intelligent waiver depends upon the particular facts and circumstances surrounding each case, including the background, experience, and conduct of the accused. (*People v. Martin* (1984), 102 Ill. 2d 412, 425.) It is impermissible, however, to presume waiver from a silent record. (*Miranda*, 384 U.S. at 475, 16 L. Ed. 2d at 724, 86 S. Ct. at 1628, *Martin*, 102 Ill. 2d at 425.) But it is equally clear that a valid waiver is not dependent upon an express statement of waiver, and when an individual gives a statement without requesting a lawyer after having been admonished of his rights and indicating that he understands them, it is evidence that he chose to waive those rights. See *Martin*, 102 Ill. 2d at 425.

Although his testimony was challenged, McGury testified that defendant did expressly waive his rights and agree to be interviewed. The conclusion that defendant did waive his rights is also supported by the totality of the facts and circumstances surrounding his statement, including his testimony that he was advised of all his rights, that he understood them, and that he wanted to cooperate with the police. We recognize that the trial court's resolution of the issue of waiver turned primarily upon an evaluation of the credibility

of the witnesses. Because the trial court was in the best position to evaluate the credibility of the witnesses and resolve inconsistencies in the evidence, we will not disturb the trial court's findings unless they are against the manifest weight of the evidence. (See *People v. Patterson* (1992), 146 Ill. 2d 445, 458; *People v. Rogers* (1993), 246 Ill. App. 3d 105, 110.) We hold that the court's determination was not against the manifest weight of the evidence and accordingly hold that there was no error in the denial of the motion to suppress.

■ The final issue defendant raises challenges the imposition of Super Class X penalties against him. Defendant acknowledges that this challenge is identical to that previously addressed by this court in *People v. Caraballo* (1992), 231 Ill. App. 3d 685. Consistent with the analysis set forth in *Caraballo*, we find no error in the imposition of the penalty in this case.

For the foregoing reasons, the judgment of the circuit court of Du Page County is hereby affirmed.

Affirmed.

McLAREN and GEIGER, JJ., concur.