# Illinois Official Reports

## Appellate Court

<div style="border">

### *People v. Orasco*, 2014 IL App (3d) 120633

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JASON ORASCO, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0633 |
| Filed<br>Rehearing denied | June 23, 2014<br>July 9, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for multiple offenses, including first degree murder, attempted first degree murder, armed robbery, and home invasion, were upheld over defendant's contention that his counsel was ineffective in failing to tender an instruction on compulsion, since defendant suggested the armed robbery and gave directions in connection with committing the crime, there was no evidence defendant acted under a threat of great bodily harm or death, one victim testified that defendant encouraged his companion to shoot the victims, he did not take advantage of opportunities to withdraw, and there was no reasonable probability the instruction would have been given, even if tendered, but the cause was remanded for resentencing in light of the statutory requirement that the consecutive sentences for first degree murder and attempted first degree murder be served consecutively with the sentences for home invasion and armed robbery. |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 09-CF-1536; the Hon. Amy Bertani-Tomczak, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |

Counsel on
Appeal

John M. McCarthy, of State Appellate Defender's Office, of Springfield, for appellant.

James Glasgow, State's Attorney, of Joliet (Laura E. DeMichael, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Presiding Justice Lytton and Justice Holdridge concurred in the judgment and opinion.

## OPINION

¶ 1    A Will County jury found defendant, Jason Orasco, guilty of three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2008)), one count of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)), one count of home invasion (720 ILCS 5/12-11(a)(2) (West 2008)), one count of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2008)), and one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2008)). The three first degree murder counts merged together, and the aggravated battery merged with the attempted first degree murder. The court sentenced defendant to consecutive sentences of 50 years' imprisonment for first degree murder and 25 years for attempted first degree murder, to be served concurrently with sentences of 20 years for home invasion and 25 years for armed robbery. Defendant appeals, arguing that his trial counsel was ineffective for failing to instruct the jury on the affirmative defense of compulsion. The State argues that counsel's decision was strategic and, alternatively, that it did not prejudice defendant's defense. In addition, the State claims that defendant's sentence is void because all of defendant's sentences must be served consecutively under section 5-8-4(d)(1) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-4(d)(1) (West 2008)). We affirm defendant's convictions, vacate his sentences, and remand for resentencing.

¶ 2                                    FACTS

¶ 3    Defendant was indicted on three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2008)) (counts I, II, and III); one count of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)) (count IV); one count of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2008)) (count V); two counts of home invasion (720 ILCS 5/12-11(a)(2), (5) (West 2008)) (counts VI and VII); and one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2008)) (count VIII). The cause proceeded to a jury trial.

¶ 4    At trial, Ashley Hill testified that she, defendant, Matthew Edwards, and Mary Vetor were at Vetor's house on the night of July 6, 2009. Edwards commented that the group should rob somebody to earn some money. Defendant said he knew someone they could rob, a man named Josh Terdic, whom defendant had known for several years. Defendant explained that Terdic had money and drugs at an apartment he shared with his girlfriend in Channahon. Defendant

said that Terdic worked construction and told the group his work schedule. The group decided to drive to Terdic's apartment building and wait outside until he left for work, when they would beat him up and take whatever money he was carrying.

¶ 5    According to Hill, after the group decided to rob Terdic, Vetor gave Edwards a .22-caliber pistol to use for "protection." Defendant saw Vetor give Edwards the gun. Defendant armed himself with a baseball bat. The four got in Vetor's truck and drove to Terdic's apartment building. Defendant gave Vetor directions along the way. Hill gave defendant and Edwards a prepaid cellular telephone to call for a ride after the robbery. Vetor dropped off defendant and Edwards to hide in a patch of trees down the street from Terdic's building. Vetor and Hill stayed in the truck and smoked marijuana.

¶ 6    While Vetor and Hill were smoking in the truck, police arrived and ticketed them for possession of marijuana, but did not take them into custody. After the officers finished their investigation and left the scene, Vetor and Hill drove off and waited for a telephone call from defendant and Edwards. The next morning, Vetor received a phone call, and she and Hill picked up defendant and Edwards from a friend's cabin in Channahon. Defendant appeared to be in shock.

¶ 7    The four drove to Vetor's house. The men had obtained money, which they split four ways among them. They had also taken a PlayStation 2 and a Nintendo Wii. The group watched the television news and cheered when it showed a story about the robbery. Hill did not know if defendant was cheering. Police arrived at Vetor's house that afternoon and arrested the four of them. Hill did not witness Edwards threaten defendant to participate in the robbery or witness defendant resist participating.

¶ 8    Lauren Vasilakis testified that on July 7, 2009, she was living with her boyfriend, Terdic. Early that morning she was awakened in their apartment by two men. One of them wore a mask; the other carried a gun. The masked man grabbed her from behind and put his arm around her neck. She could feel his heart "racing." She recognized the masked man's voice and knew he was defendant, whom she had known for more than 10 years and who was a friend of Terdic's. The unmasked man, whom Vasilakis later identified as Edwards, left the bedroom to look for money and valuables. He gave defendant the gun to stand watch over Vasilakis and Terdic. When Edwards returned, defendant gave him back the gun.

¶ 9    Vasilakis heard Edwards threaten Terdic that if he did not give them more money, they would kill him. Edwards said that he had killed his own sister and had no remorse. When Terdic would not stop fidgeting, defendant pulled a bat out of his duffel bag and hit Terdic full force in the leg. Eventually, defendant and Edwards became convinced that they had recovered everything of value in the apartment. They discussed how to ensure that Terdic and Vasilakis did not call the police after they left. Vasilakis suggested that they could tie up her and Terdic. The men initially agreed, and Edwards gave the gun to defendant while Edwards tied them up.

¶ 10    Defendant then tried to choke Vasilakis into unconsciousness, but ended up only making her dizzy. Edwards and defendant conferred again, and Vasilakis heard defendant tell Edwards to "just do it."

¶ 11    Vasilakis felt someone kneel over Terdic and heard a gunshot. Then someone kneeled over her, and she could feel a gun pointing at her head through a pillow. She heard two clicks and then a ringing sound and felt wetness around her ear. She played dead until the two men left. After they left, Vasilakis untied herself and called 911 from a neighbor's apartment. Vasilakis

was taken to the hospital and treated for a gunshot wound to the head. Doctors were unable to remove the bullet.

¶ 12    The State played for the jury a recorded interview with defendant conducted after his arrest. Throughout the interview, defendant states that Edwards was in charge and defendant participated because he was doing what he was told and had no choice but to participate. According to defendant, the plan to rob Terdic came about after Edwards browsed through the contacts listed in defendant's cellular telephone. Upon seeing Terdic's name, Edwards decided that the group should rob Terdic.

¶ 13    Defendant explained that Vetor gave him and Edwards a gun with instructions to kill Terdic and Terdic's girlfriend. As defendant and Edwards waited in the trees near Terdic's building, they witnessed the police investigating Vetor and Hill in the truck. According to defendant, Edwards said he was going to kill the officers if they arrested Vetor. After the police left, Edwards and defendant approached the building to find a way into Terdic's apartment. Edwards found a way in, and defendant followed because he was scared.

¶ 14    Defendant stated that he and Edwards entered Terdic's bedroom and woke Terdic and Vasilakis. Edwards told defendant to choke Vasilakis so that she could not move. Defendant did as he was told. Terdic told the men that he had money hidden in the apartment, but Edwards had already found the money in another room. Edwards instructed Terdic and Vasilakis to lie face down and put a pillow over each of their heads. Edwards gave defendant a bat and told him to hit Terdic with it if Terdic kept squirming. Terdic moved, and defendant hit him in the leg with the bat.

¶ 15    Edwards left the room to find some rope and gave defendant the gun to stand guard. Edwards returned and tied up Terdic and Vasilakis. Edwards and defendant were contemplating what to do with their captives. Defendant told Edwards that they needed to kill them to keep them from telling police. According to defendant's statement, he did not really mean what he said and was only doing as he was told. Edwards then shot both Terdic and Vasilakis in the head. Defendant and Edwards left Terdic's house and travelled to a friend's cabin, where Edwards broke in. Edwards called Vetor and asked her to pick them up. When they split up the money, defendant received approximately $70. Defendant stated that Edwards had forced him to commit the robbery by pointing the gun at him and threatening to kill him if he tried to run or told police. Defendant did not explain when or where Edwards had made that threat.

¶ 16    During closing arguments, defense counsel argued that "[t]he facts don't hold up the proposition of accountability." According to counsel, defendant and Edwards were trying to determine what to do with their captives. At that point, defendant "heard a pop and turned, and then he saw [Edwards] shoot [Terdic]. This is far and above what [defendant] signed up for. There was no intent for all of this." Then counsel changed approach, arguing that defendant was scared and his participation in the crime was merely "self-preservation" because he was scared that Edwards would kill him. Counsel focused on the facts that Vasilakis felt defendant's heart racing and that defendant was in shock after the crime as evidence establishing that defendant was not a willing participant.

¶ 17    The jury was instructed on accountability but not on the affirmative defense of compulsion. Defense counsel never tendered an instruction on compulsion. The jury returned guilty verdicts on all counts.

¶ 18    At sentencing, the State informed the court of the sentencing ranges available on each count. The State asserted that counts I and IV (intentional murder and attempted murder) were required to run consecutively, but counts VII and VIII (home invasion and armed robbery) should run concurrently to each other and to counts I and IV. The court summarized, "the defense in the case is that you were terrified and there was nothing else you could do other than participate in this crime as far as it went." The court then pronounced defendant's sentences:

> "I agree with the State as far as the counts that Counts 2 and 3 would merge into Count 1. There is the enhancement with the firearm. I will sentence you to 50 years in the Illinois Department of Corrections on that matter and that is at 100 percent.
>
> Count 4 is the aggravated battery with a firearm.[1] I am going to sentence you consecutive because the law requires that it be consecutive to 25 years in the Department of Corrections at 85 percent.
>
> Count 7, the home invasion, 20 years at 85 percent, that will be concurrent.
>
> And the armed robbery, 25 years concurrent. There is a three-year mandatory supervised release period. You will be given credit for all time served that you're entitled to, and I will enter judgment for any outstanding fines, costs, and fees."

¶ 19    Defendant appeals.

¶ 20                                ANALYSIS

¶ 21    On appeal, defendant claims that trial counsel provided ineffective assistance by failing to tender a jury instruction on the affirmative defense of compulsion (720 ILCS 5/7-11 (West 2008)). The State responds that a compulsion defense was not supported by the evidence. In addition, the State claims that all of defendant's sentences must be served consecutively under the mandate of section 5-8-4(d)(1) of the Code. 730 ILCS 5/5-8-4(d)(1) (West 2008).

¶ 22                     A. Ineffective Assistance of Counsel

¶ 23    Criminal defendants enjoy a constitutional right to effective counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed upon a claim that counsel provided ineffective assistance, a defendant must show that: (1) counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's poor performance, there is a reasonable probability that the result of the proceedings would have been different. *Strickland*, 466 U.S. at 687. To establish deficient performance, a defendant must overcome a strong presumption that counsel's actions were the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 342-43 (2011). However, "[w]here defense counsel argues a theory of defense but then fails to offer an instruction on that theory of defense, the failure cannot be called trial strategy and is evidence of ineffective assistance of counsel." *People v. Serrano*, 286 Ill. App. 3d 485, 492 (1997).

¶ 24    In the present case, defendant claims that counsel was ineffective for failing to tender a jury instruction on compulsion. The affirmative defense of compulsion is available when a

_____

[1]The court apparently misspoke, as count IV charged attempted first degree murder. The court's written mittimus clarified that the court sentenced defendant to 25 years for attempted first degree murder, not aggravated battery. No sentence was imposed for aggravated battery as that count merged with the attempted murder count.

defendant has committed criminal acts under a reasonable belief that death or great bodily harm would be inflicted upon him if he refused to commit the acts. 720 ILCS 5/7-11 (West 2008). The defense is not available if the compulsion arises from the negligence or fault of the defendant or if the defendant had any opportunity to withdraw from the criminal enterprise but failed to do so. *People v. Humphries*, 257 Ill. App. 3d 1034, 1044 (1994).

¶ 25        A defendant need only present some evidence of an affirmative defense–such as compulsion–in order to raise the defense and justify an instruction. *People v. Pegram*, 124 Ill. 2d 166, 173 (1988). After a defendant raises a defense, the burden shifts to the State to prove beyond a reasonable doubt that defendant's conduct was not justified by the offense. *People v. Johns*, 387 Ill. App. 3d 8, 13 (2008).

¶ 26        In the present case, defense counsel argued that defendant was compelled to commit the charged offense, but counsel failed to tender a jury instruction on compulsion. That error deprived the jurors of the ability to acquit defendant if they found that he acted under the threat of death or great bodily harm. However, defendant cannot succeed upon his claim of ineffective assistance, because counsel's failure to tender an instruction did not prejudice defendant.

¶ 27        To establish prejudice in this case, defendant must show that, had counsel tendered a compulsion jury instruction, there is a reasonable probability that the court would have allowed the instruction and the jury would have acquitted defendant based on compulsion.

¶ 28        The evidence presented at trial was insufficient to support a jury instruction on compulsion. First, the evidence did not establish that defendant committed the acts constituting any of his offenses under threat of great bodily harm or death. Defendant's repeated statements that he was just doing what he was told do not constitute compulsion, absent an impending threat of great bodily harm. *People v. Scherzer*, 179 Ill. App. 3d 624, 645 (1989). The only reference to a threat of any kind was defendant's statement that "He [Edwards] pretty much pointed the gun at me. And then pretty much told me if I snitched or even tried to run off that he would kill me." Defendant does not elaborate on when this alleged statement was made, nor was the statement confirmed by any other testimony. In fact, Vasilakis testified that defendant was the one encouraging Edwards to kill her and Terdic. Defendant himself said in his recorded statement that he encouraged Edwards to shoot Vasilakis and Terdic to prevent them from reporting the robbery.

¶ 29        Second, any potential compulsion arose from the fault of defendant. See *Humphries*, 257 Ill. App. 3d at 1044. Hill testified that defendant suggested the idea to rob Terdic. Defendant then gave the group information about Terdic: that Terdic would have cash from his job in construction and that he lived in an apartment in Channahan with his girlfriend. Defendant then gave directions as Vetor drove the group to Terdic's apartment.

¶ 30        Third, even assuming that defendant was acting under compulsion, he had opportunities to withdraw from the criminal enterprise but chose not to. See *Scherzer*, 179 Ill. App. 3d at 645-46. In particular, while inside Terdic's apartment, defendant on two separate occasions came into possession of the only firearm. Once in possession of the gun, defendant was no longer susceptible to any potential threats from Edwards. While defendant was the only one in the house armed with a handgun, he cannot credibly argue that he was acting out of fear of the unarmed Edwards. Defendant failed to withdraw from the criminal enterprise when he had the perfect opportunity to do so.

¶ 31      Defendant did not receive ineffective assistance counsel. Had counsel tendered a jury instruction on compulsion, there is not a reasonable probability that the trial court would have given the instruction. Had the trial court given the instruction, there is not a reasonable probability that the jury would have acquitted.

¶ 32                           B. Sentencing

¶ 33      The State claims that the sentencing judgment is void because all of defendant's sentences must be served consecutively. Defendant concedes the issue, and the parties agree that we should vacate defendant's sentence and remand for resentencing. We may correct a void sentence at any time. *People v. Thompson*, 209 Ill. 2d 19, 25 (2004).

¶ 34      Section 5-8-4(d) of the Code mandates consecutive sentences in certain situations. 730 ILCS 5/5-8-4(d) (West 2008). The only situation applicable to the present case is described by section 5-8-4(d)(1), which mandates consecutive sentences when "[o]ne of the offenses for which the defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4(d)(1) (West 2008). We interpret that language to require consecutive sentences in two situations: (1) where the defendant was convicted of first degree murder; and (2) where the defendant was convicted of a Class X or Class 1 felony, and the defendant inflicted severe bodily injury during the commission of that felony. See *People v. Whitney*, 188 Ill. 2d 91, 98-99 (1999) (the severe bodily injury must result from the commission of the Class X or Class 1 felony). It seems absurd to refer to severe bodily injury in connection with a conviction for first degree murder; first degree murder necessarily results in the most severe bodily injury–death.

¶ 35      In the present case, counts I, IV, VII, and VIII were all triggering offenses mandating consecutive sentencing under section 5-8-4(d)(1). Count I was first degree murder. Count IV charged attempted first degree murder for the gunshot to Vasilakis's head. Attempted first degree murder is a Class X felony, and a gunshot to the head constitutes a severe bodily injury, especially considering that the bullet remains lodged in the victim's head. Count VII charged home invasion, a Class X felony. A gunshot to Vasilakis's head was a severe bodily injury inflicted during the commission of the home invasion and armed robbery, both Class X felonies. Count VIII charged armed robbery, also a Class X felony. Likewise, Terdic's death occurred during the commission of those Class X felonies. In sum, section 5-8-4(d)(1) required that all four sentences be served consecutively.

¶ 36      The sentencing order imposed by the court failed to comply with the requirements of section 5-8-4(d)(1). Therefore the order is void. See, *e.g.*, *People v. Arna*, 168 Ill. 2d 107, 113 (1995) ("A sentence which does not conform to a statutory requirement is void."). We vacate the order and remand for resentencing.

¶ 37                           CONCLUSION

¶ 38      The judgments of conviction of the circuit court of Will County are affirmed. The judgment of sentence is vacated, and the cause is remanded for resentencing consistent with this opinion.

¶ 39      Affirmed in part and vacated in part; cause remanded.